Filed 1/27/15  In re Isaiah T. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re ISAIAH T., et al., Persons Coming Under the Juvenile Court Law. | |
| TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ENRIQUE T.,<br><br>Defendant and Appellant. | F069742<br><br>(Super. Ct. No. JJV066357A-G)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Tulare County.  Michael B. Sheltzer, Judge.

Julie E. Braden, under appointment by the Court of Appeal, for Defendant and Appellant.

Kathleen Bales-Lange, County Counsel, John A. Rozum and Jason Chu, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Enrique T., Sr. (father) appeals from an order terminating parental rights to his seven children (Welf. & Inst. Code, § 366.26),[1] but challenges those orders only as they apply to his four oldest sons, Isaiah, Elijah, Enrique and Nicholas. Father contends the juvenile court's finding that Isaiah, Elijah and Enrique were likely to be adopted was not supported by substantial evidence and the juvenile court erred in declining to apply the beneficial parent-child relationship exception to the adoption of all four boys. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Father and Marie T. (mother) have six children together: Elijah, born in April 2008; Enrique, born in April 2009; Nicholas, born in June 2010; Justine, born in October 2011; Aaron born in July 2012; and Antonio, born during the course of these dependency proceedings, in December 2013. Mother also has a son from another relationship, Isaiah, who was born in January 2007; the juvenile court found father to be Isaiah's presumed father.

The Tulare County Health and Human Services Agency (Agency) initiated this dependency proceeding in July 2012, after mother tested positive for methamphetamine at Aaron's birth. Aaron was born preterm at 31 weeks and was in the neonatal intensive care unit due to medical problems.

This was not the first time mother had tested positive for methamphetamine at the birth of a child – she also tested positive at Justine's birth the prior year.[2] The Agency received a referral after Justine's birth; as a result, mother and father were referred to random drug testing and NA/AA meetings. Mother's drug tests were negative until

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Mother also had a prior dependency case in Los Angeles County, which began when another baby, Alexis, tested positive for methamphetamine after her delivery in December 2003. Dependency jurisdiction was taken over Alexis and mother's two other children, Matthew and Daniel. Mother's services were terminated and the three children placed with their father, Antonio G.

March and May 2012, when she tested positive for methamphetamines. Father, who had a medical marijuana card, tested positive for marijuana on his test dates; he also tested positive for methamphetamines in March 2012. The children were not taken into protective custody at that time because the parents were meeting their needs.

The day after Aaron's birth, social workers met with father at the family's home; only Enrique, Nicholas and Justine were there with him. Father told the social workers he had smoked marijuana that day and was on prescription medications for seizures; the seizures began after he was shot in the head "years ago." During the interview, father received two calls from mother; during the second call, father told mother he would not let the Agency take the children and asked her what he should do. Mother told father she was going to leave the hospital. After one of the social workers contacted law enforcement, father told the social workers to get out of the house. He put the three children in a bicycle cart, got on the bicycle and began pedaling recklessly while trying to evade the social workers. When officers arrived, they found brass knuckles in father's pocket and arrested him. The three children were placed into protective custody. The other two children, Elijah and Isaiah, were with their maternal grandmother. Father refused to say where she was. Later that day, the maternal grandmother brought the two to the Agency without further incident.

The Agency alleged these facts in its petition as a basis for dependency jurisdiction under section 300, subdivision (b) (failure to protect), as mother and father's substance abuse, their failure to protect Aaron and Justine from in utero exposure to controlled substances, and father's reckless behavior in trying to evade the social workers, put the children at risk of harm. Jurisdiction was further alleged under section

300, subdivision (j) (abuse of sibling), based on mother's prior dependency case in Los Angeles County.[3]

All six children were detained and five were placed in foster homes. Initially, Isaiah and Elijah were placed together in one home, Enrique and Nicholas were placed together in a second home, and Justine was placed alone in a third home. Aaron remained hospitalized. On July 31, 2012, Isaiah, Elijah, Enrique and Nicholas (collectively the boys) were placed together in another foster home, while Justine remained in her placement. When Aaron was released from the hospital on August 28, 2012, he was placed with Justine in her foster home.

By August 20, 2012, the boys were adjusting well to their new home. According to the foster parent, the boys all used foul language, but she did not report any behavior problems. None of the boys were receiving counseling services or services through Central Valley Regional Center; they appeared to be on track developmentally. Isaiah was going to start kindergarten, while Elijah was going to start preschool. The previous foster parent reported some aggressive behaviors between Isaiah and Elijah, but they were able to be redirected, and that Nicholas would cry all the time. The current foster parent was working on correcting the boys' bad language.

Pursuant to the juvenile court's order and the Agency's agreement, father and mother had two-hour weekly supervised visits with the children. The parents were appropriate during visits and interacted well with the children.

A Court Appointed Special Advocate (CASA) visited the boys in their foster home on August 17, 2012. The boys seemed shy, but followed directions well. The foster mother reported the boys seemed to be typically active, and interacted and fought like

---

[3] The petition also contained jurisdictional allegations under section 300, subdivision (g) based on father's incarceration due to his arrest and Isaiah's father leaving him without provision for support. The Agency dismissed these allegations at the jurisdictional hearing.

4.

any other siblings. Isaiah interacted with the CASA, though he was shy, and tried to answer all the questions asked about the "ASQ." Isaiah understood and would say four to five word sentences, but the foster mother did not always understand him well. Isaiah scored low in fine motor and problem solving, but scored well on gross motor, personal social skills and social/emotional. According to the foster mother, Isaiah did not like to sleep and sometimes had a hard time following directions. Isaiah liked to run around, was lovable and could be sensitive.

Elijah was observant and quiet. He scored average in communication, because he had trouble finishing words with their proper endings. The foster mother had difficulty understanding what he says. Elijah scored low in fine motor and problem solving, demonstrating he needed practice in those areas, but scored well in gross motor and personal-social area. According to the foster mother, Elijah was curious, calm and a good child.

Enrique was active and followed directions well. He scored average in communication and personal-social, low in fine motor, and well in gross motor, problem solving and social/emotional ASQ. According to the foster mother, while Enrique communicated, his language was not clear; he was a good boy, lovable, sweet, and liked to run and be silly.

Nicholas, who scored well on the communication, gross motor, personal-social and social/emotional areas of the developmental ASQ, but average on fine motor and low in problem solving, was a loving child who liked to cuddle. The foster mother was willing to provide the boys permanency should the parents fail to reunify.

A combined jurisdiction/disposition hearing was held on September 26, 2012. According to the social worker's report, the Agency had been working with mother and father for ten months after Justine was born drug-exposed; they were told numerous times about the risks and consequences of continued drug use while caring for the children. Even with continued services, however, they did not make the changes necessary for

5.

Aaron to be born healthy. The Agency recommended that mother not be offered reunification services based on her failure to reunify with other children, and her extensive use of drugs and resistance to court-ordered treatment. The Agency, however, recommended reunification services for father.

The juvenile court found the petition's allegations true after mother and father submitted on the social worker's report. The juvenile court adjudged the children dependents, removed them from their parents' custody, and ordered reunification services for father. Father was given twice weekly one-hour visits, to be supervised by the Agency or a designee. The Agency had discretion to increase the length and frequency of visits, including unsupervised and overnight visits.

Father received 18 months of reunification services. While he had completed his case plan by the time the 18-month review hearing was held in February 2014, he had not made arrangements for a suitable residence that would accommodate him and the children, he continued to test positive for marijuana and he continued to be in a relationship with mother.

During the reunification period, father visited the children, but never moved beyond supervised visits of two hours per week. He and mother visited the children together until July 2013, when, on the Agency's recommendation, father agreed to visit separately from mother. When father and mother were visiting together, they sometimes failed to attend visits due to missing the bus. The Agency suggested to father in July 2013 that he find a relative to help supervise visits so he could move to unsupervised visits. Father, however, could not find a relative to help supervise visits; his adult children did not want to do so because they did not get along with mother and felt she would cause problems.

A supervising social worker reported in November 2012 that the visits with mother, father, and the children, were non-productive due to the parents' limited interaction with the children. The children would kick one another and curse, and the

6.

social worker did not observe any one-on-one attention or discipline from the parents. By March 2013, however, the visits were better. The children were quick to listen to father; he would give them a look and put his hands on his belt to get them to stop their bad behaviors. By September 2013, visits with father were going well and he was trying to redirect the children when they used foul language, although he was inconsistent in doing so. He struggled when all the children were present at visits, as the boys were "high maintenance"; they needed constant monitoring because they would run away, fight or cuss at each other. In January 2014, the Agency reported that father struggled with redirecting the children after they displayed negative behaviors, or talked back to him or other adults. Father had not progressed to unsupervised visits because he was not ready for them, as demonstrated by his failure to intervene in the children's negative behaviors and to locate a family member to assist him.

In October 2012, the boys were moved to another foster home due to the caretaker's job schedule and lack of a babysitter; they remained in this new home throughout the reunification period. When the boys were first placed in foster care, they would try to eat off the floor and from the garbage can. They would hit, kick and curse. By March 2013, they were learning to eat healthier, curse less and follow directions. The Agency reported in March 2013 that Elijah stated that father had guns in the home, when he grew up he wanted to be like father, and he wanted a gun to shoot the foster parent when he grew up. The Agency also reported that Isaiah was caught humping Elijah after having a bath; Isaiah said he had seen his parents do it.

During the 2012-2013 school year, Isaiah attended kindergarten while Elijah attended preschool. Neither had a discipline record or an individualized education program (IEP). The CASA reported in March 2013 that it was hardest on Isaiah when the parents would miss visits, as he would be verbally and physically aggressive toward his siblings and others; the three older boys would cry when the parents failed to appear for visits. Isaiah was happy after visits, but the foster mother did not think Enrique or

Nicholas wanted to visit as they would frown and avoid mother. The CASA further reported that the foster mother said Isaiah would act out sexually, by attempting to kiss Nicholas and her grandson on the mouth, and attempting to grab other children's private body parts and engage in sexual positions and motions. Elijah's teacher said that he had been hitting children lately.

Isaiah and Elijah were both referred to Visalia Youth Services for an assessment in February 2013, but services were delayed, because the parents failed to sign the paperwork for Isaiah and Elijah to begin therapy. Both had intake assessments in May 2013. Isaiah was diagnosed with oppositional defiant disorder, and problems with primary support group and social environment, while Elijah was diagnosed with disruptive behavior disorder. Ongoing therapeutic services were recommended for both of them. Isaiah was making progress in therapy; the foster mother reported his defiant and sexualized behaviors had decreased and he was doing well with redirection in the home. Elijah's treatment goal was to be able to verbally express his needs and wants without fighting, having tantrums, or getting physically aggressive. Elijah's therapy had been inconsistent; he was missing group sessions because they conflicted with the foster mother's job.

The Agency reported in March 2013 that Enrique was adjusting well to his placement and the foster parent was working on correcting his bad language. In November 2012, he had been diagnosed with failure to thrive due to poor interactions and delayed speech; he was being monitored for the condition.

The foster mother reported in September 2013 that the boys' behavior had improved. Isaiah was not aggressive with adults and children, and was now loving and gentle with the foster mother and others, although he used to hit and curse at people regularly. Enrique still was having difficulty communicating verbally. CASA mailed an IEP assessment request to Enrique's school.

8.

By January 2014, the boys continued to struggle with cursing and being physically assaultive toward each other. They constantly had bruises and scratches, and admitted fighting with each other. According to the foster mother, there had not been any sexualized behaviors since the initial report. Elijah had been abusive toward the foster mother; he kicked her in the shin and threatened to kick her when he refused to do what she told him. The foster mother was interested only in providing care until a more permanent home could be found. While she had grown attached to the boys and loved them and would find it difficult to see them leave, she could not provide for them long-term due to her age.

Isaiah and Elijah, who were both in kindergarten as Isaiah had been held back because his teacher felt he was not ready to advance to first grade, were not having behavioral issues at school. They were attending therapy services and starting to receive therapeutic behavioral services (TBS) in the home. Elijah did not begin therapy until September 3, 2013; by the time of a November 2013 therapy report, he had only two sessions so there was no reported progress. Instead, Elijah's symptoms had worsened; he engaged in tantrums, defiance, swearing and physical aggression daily; had enuresis and encopresis at home and school daily, and demonstrated advanced sexual knowledge. His symptoms impaired his functioning at home, in school and in the social environment, and he was in danger of losing his placement. Elijah's therapist referred him for TBS services.

In a December 10, 2013 therapy report for Isaiah, it was noted that Isaiah was participating in individual therapy, which would be shifting to family therapy. TBS had been approved. Isaiah completed phase one of sexual abuse treatment in a group setting. His therapist noted a decrease of intensity and frequency of impairing symptoms and behaviors. The therapist was concerned about his primary support system, as the foster parent would fail to recall treatment dates; accordingly, Isaiah's progress was developing slowly.

At every review hearing, the Agency recommended termination of father's services. Consequently, adoption assessments were prepared for each hearing. A March 5, 2013 adoption assessment deemed all the children adoptable. While Justine and Aaron's foster parents wanted to adopt them, the boys' foster mother was not interested in adoption, although she was willing to provide permanency for Nicholas. The Agency reported a potential family was interested in providing permanency for the boys. The assessment reported there would not be any significant emotional detriment to the children if parental rights were terminated and that the children were not very attached to their parents.

The September 20, 2013 adoption assessment reported that the boys were not adoptable at that time because they were attached to mother and father, and their current foster parent was not interested in adoption. The adoption social worker noted father had been diligent in visits and in completing most of his case plan; the social worker opined the boys had regular and beneficial contact with mother and father, and would benefit from continuing those relationships. The social worker recommended the boys' visits with mother and father be reduced to two times per month for one hour each; while the parents were visiting consistently and the boys had a bond with both of them, the boys needed less frequent visits to assure their stability. The adoption assessment recommended long term foster care for the boys, "who continue to have regular and beneficial contact with their parents."

In the January 9, 2014 adoption assessment, the adoption social worker opined there would not be any significant emotional detriment to the children if parental rights were terminated, as the children were not very attached to their parents. The social worker recommended the parents' visits be reduced to one hour per month, the permanent plan for Justine and Aaron was to be adopted as a sibling set by their current caregivers, and the boys' permanent plan was for the social worker to complete a "Child Available Form" so a match for the boys could be performed.

10.

In December 2013, mother gave birth to Antonio (baby); although they both tested negative for methamphetamine, mother had tested positive for methamphetamine a month before the birth. The Agency filed a dependency petition seeking jurisdiction based on mother's use of methamphetamine during her pregnancy and father's failure to protect the baby. The juvenile court found father to be the baby's presumed father and detained the baby. The baby was placed in a third foster home, separate from his siblings.

At father's request, the juvenile court continued the combined 18-month review hearing and jurisdiction/disposition hearing on the baby's petition, which was originally set for January 29, 2014, to February 19, 2014, to give him time to find appropriate housing. Father, however, did not find housing. On February 11, a child family team (CFT) meeting was held on Isaiah's behalf. He qualified for "Katie A. therapy services[,]" which were to begin on February 19. These services would take place once or twice a week in the home. Isaiah would continue to participate in weekly individual therapy appointments. Elijah was receiving TBS services in the home three times per week, and participated in weekly individual therapy. The foster mother continued to have difficulty taking the boys to their appointments; the Agency agreed to provide respite care for her other children so she could take the boys.

At the February 19 review hearing, father withdrew his contest and submitted on the reports. The juvenile court terminated his reunification services. Visitation remained at two hours per week. As to the baby, the juvenile court found the petition's allegations true after mother entered a no contest plea and father submitted on the social worker's reports. The juvenile court denied the parents reunification services, and set a section 366.26 hearing for all the children for June 11, 2014.

In May 2014, therapy reports were submitted for Isaiah and Elijah. Isaiah was progressing according to his ability and length of time in treatment. The foster mother continued to have difficulty getting him to appointments. Isaiah was referred to a school-

11.

based group for adaptive socialization. According to the foster parent and academic and mental health staff, Isaiah's symptoms and behaviors had decreased notably. The therapist observed an increase in adaptive interactions with siblings, no aggression or profanity, and that Isaiah had gained the ability to request assistance from adults when needed. Elijah was benefitting from TBS; a decrease in the intensity and frequency of impairing symptoms and behaviors had been noted. He was progressing according to his cognitive ability and length of time in treatment. Elijah was referred to participate in school-based behavioral modification groups, where he received weekly support and instruction. The therapist was concerned with Elijah's cognitive deficit; Elijah presented with features of fetal alcohol syndrome and possible exposure to controlled substances in utero.

Enrique had been found eligible for special education services in February 2014, with a primary disability of speech or language impairment (SLI). Enrique's disability affected his participation in appropriate activities at his preschool, as his expressive language delay and numerous sound errors made his speech difficult for others to understand and impacted his communication with staff and peers. It was noted in the IEP that Enrique was friendly, cooperative and well-behaved, and that sometimes in the classroom and at the home he gets angry and will scream. The assessor further noted that Enrique was focused during the assessment and attempted all tasks, and even though his speech was difficult to understand, he continued to participate and was eager to share what he knew. He was to receive services through collaboration between the speech language specialist, parent and teacher, who would facilitate age-appropriate sound production.

On May 30, 2014, the Agency filed a section 366.26 WIC report that recommended termination of parental rights so the children could be freed for adoption. The social worker noted that, according to Isaiah's therapist, Isaiah was progressing in treatment and there had been a reduction in symptoms and behaviors. For both Isaiah and

Elijah, the therapist was concerned with the substitute care provider's primary support system, which had been minimal due to other obligations, the visitation schedule, and extra-curricular activities. Isaiah and Elijah both participated in conjoint sessions twice a month, and a social skills group at school and behavioral modification four times a month. Isaiah and Elijah had been identified as "Katie A." qualified, meaning they met the criteria for extensive mental health services for children in foster care. At an April 15, 2014 CFT meeting, the team decided Isaiah would benefit from additional mental health services at school and in the home, and the team agreed on May 27, 2014 that Isaiah and Elijah would continue to receive CFT services. Isaiah and Elijah were not prescribed any psychotropic medications. As of April 15, 2014, Elijah was no longer receiving TBS services because he had made progress towards the goals set for him.

Enrique was receiving speech therapy due to his speech and language delay that impaired his ability to communicate. He was assessed for Katie A. services, but was not eligible. The social worker, however, was going to refer him for a mental health evaluation due to concerns of his behaviors, such as fighting, hitting, screaming, and cussing during visits and in placement.

The boys' substitute care provider, who continued to be unwilling to adopt due to her age, reported that the boys all used foul language and fought all the time. However, the boys were stable and had developed a relationship with the substitute care provider, who they referred to as "grandmother."

The social worker reported that father had regularly visited the children since they were removed from his care, with the exception of a few missed visits due to transportation problems or miscommunication. Before their removal, father appeared to be involved and committed to the children. He was affectionate with the children during visits and tried to give them as much attention as possible, but tended to favor a few children over the others. He was noted to be oblivious to the children's needs during visits, as he would ask supervising staff what to do with the children when they needed to

use the restroom or be changed. He unsuccessfully attempted to redirect and discipline the children after they displayed negative behaviors or talked back to him or other adults. The children would fight, yell and hit each other, whine, cry, run around or bang toys during visits. Father appeared to not pay attention to what the children were doing until supervising staff pointed it out to him. The children looked forward to the snacks he brought to the visits. Father tried to make the best out of the visits despite how many children there were, and showed them affection by hugging and kissing them. Father would read and try to feed the baby during visits, but he struggled with focusing on the children individually and what they were doing. On many occasions, the children refused to visit with father until their caregivers prompted them to do so. The social worker had observed the children running out towards their caregivers once in sight, not even saying goodbye to father. The visits did not benefit the children, since the children were constantly out of control. Father told the children how he was decorating their rooms, giving them the idea they would be moving back to live with him and mother.

While mother and father visited consistently and showed affection towards the children, they continued to set poor boundaries for each other and the children. Though the parents visited separately and denied being in a relationship, they let the children know what to expect from the other parent when that parent was to visit. When the parents did not follow through with their promise, the children were affected, especially Enrique, who had been noted to cry at one visit when mother cancelled, because he was expecting something from them. The parents had not been able to develop meaningful parent/child relationships during visits, since the children did not pay attention or listen to them.

The social worker noted the children were deemed adoptable in the last adoption assessment, and that their identified adoptive parents had stated their desire to adopt the children and raise them as their own. Isaiah and Enrique were to be placed in the

adoptive home of their younger siblings, Justine and Aaron. Elijah and Nicholas were to be placed with the adoptive family of their youngest sibling, Antonio.

The boys were having frequent visits, including overnight visits, with their identified adoptive parents. The boys responded to their directives and appeared comfortable in their presence. The identified adoptive parents for Justine and Aaron stated they were willing to adopt Isaiah and Enrique, while the identified adoptive parents for Antonio stated they were willing to adopt Elijah and Nicholas. All the identified adoptive parents wanted to keep the siblings together, and had been making efforts and commitments to develop a relationship with the children by picking them up weekly for visits, trips and overnight visits before the boys were placed in their homes. The identified adoptive parents had established good relationships with each other and were willing to continue the sibling relationships. On May 19, when the social worker asked the boys how they felt about living with the identified adoptive parents, they said "yeah" with excitement.

The social worker opined that given the boys' characteristics, including their age, mental health status, and general good health, there were foster-adopt families that may be willing to adopt the boys aside from the identified adoptive parents of their siblings. The social worker further stated that the parents had not demonstrated they were capable of providing the children with adequate care, a safe living environment and protection from harm; they had long substance abuse histories and continued to struggle with stability and controlled substance issues, which they failed to ameliorate. Accordingly, the Agency recommended a permanent plan of adoption with the identified adoptive parents.

On June 3, 2014, Justine and Aaron's foster mother told the CASA that she was very attached to Justine and Aaron, and hoped to adopt them. The CASA noted the foster mother had also "expressed interest" in adopting Isaiah and Enrique; she had coordinated with the Agency to have Isaiah and Enrique in her home for overnight visits with Justine

and Aaron, which had been successful, making them hopeful they would be able to adopt all four children. The foster mother, however, expressed some reservations, stating that if adopting Isaiah and Enrique did not work, she would still like to adopt the younger two and would provide long-term foster care for the older two. The foster mother was concerned about Isaiah and Enrique's behavioral issues. The social worker was scheduling a team decision meeting to address these concerns. The CASA visited the boys in their foster home. They appeared happy and healthy. The CASA asked the boys about their overnight visits with their respective new foster mothers; the boys' responses were "very positive" with comments like "I get to sleep in the top bunk" and "I like to play with my sister."

During a team decision meeting held on June 6, which the identified adoptive parents attended, it was decided to move the boys into their identified adoptive homes by June 18, 2014. The social worker noted that Justine and Aaron's identified adoptive parents were "very interested" in adopting Isaiah and Enrique, while the baby's identified adoptive parents were also "very interested" in adopting Elijah and Nicholas.

An updated adoption assessment was completed on June 9, 2014 by another adoption social worker. The children were deemed adoptable and adoption was identified as the plan that was in the best interest of the children and their identified prospective adoptive parents. According to the adoption social worker, the children were not very attached to their parents and they would not experience any significant emotional detriment if parental rights were terminated. Moreover, the adoption social worker opined that visits were a barrier to matching the children with an adoptive family. The social worker agreed adoption was in the children's best interest and noted there were two identified adoptive families who knew the children and were willing to both adopt and secure post-adoptive sibling contact.

With respect to parent/child relationships, the social worker opined in an addendum report filed on June 10, that the attachment between the children and their

16.

parents was not strong. The social worker noted the parents struggled to have a relationship with their children during visits. The children would not seek out their attention unless it was needed to take a toy away from another child, and usually played by themselves and ate during visits. The children sought attention from whoever was supervising the visit. The children would curse and call their parents' names; they did not look to the parents for comfort when they hit each other or were crying, and did not listen to their parents' directives to stop hitting each other. Sometimes Enrique did not want to go visit the parents and would call them the "B" word. The parents would not comfort the children, except for Justine or the baby, and would just tell the other children not to cry without comforting or holding them. While father would hold and feed the baby, and tried to hold Justine for pictures, he did not do the same for the other children.

The social worker further reported that both Isaiah and Elijah had good attendance at school, but their grades appeared to be low. The identified adoptive parents were aware of the children's low school performance, and planned to seek resources and support to help them. On April 23, Elijah had one behavioral referral for hitting another student in the mouth and lost his recess.

The two identified adoptive families were present at the June 25, 2014 hearing. They confirmed that, as of June 18, Isaiah, Enrique, Justine and Aaron were together in one placement, while Elijah, Nicholas and Antonio were together in the other placement.

Father testified that he visited the children weekly, supervised at the Agency's office. During visits, father talked to Isaiah, Elijah and Enrique and showed them pictures of his workplace; he played games with the younger children and sometimes read to them. When visits started, the children, who call him "Dad," ran to him and wanted hugs, and they would tell him about their day. All of the children, except the baby, told father they wanted to go home with him. Father denied promising the children that they would be coming home. When asked about the social worker's statement that he favored some of the children, father explained that he would pay more attention to one

child when that child started to cry; he wanted to calm the child down and stop the child from crying, as he was concerned the other children would also start crying. Father believed he successfully redirected and disciplined the children. Father testified that Enrique would talk back to him and had a habit of cussing. When father told him not to cuss, father would have to hold him because he would not stay in timeout. Elijah was mad a couple weeks before; he was kicking and screaming, so father held him. Father felt that all of the children had a strong bond with him. He believed the children probably would "retaliate" or have some kind of issues if they were adopted and no longer in his care.

County counsel argued that all of the children were adoptable, as evidenced by the two families willing to adopt them. County counsel argued the juvenile court should not apply the beneficial parent-child relationship exception to termination of parental rights because, even if father's testimony were accepted as true, at best it established that he had a friendly relationship with his children and, on balance, the children would benefit more from the stability of adoption than any detriment they would receive from termination of parental rights. The children's attorney argued that, given the length of time the children had been out of the home, it was clear whatever bond they had with the parents was not as strong as the parents believed, and given the children's ages and circumstances, they were adoptable. Father's attorney argued father established both prongs of the beneficial parent-child relationship exception, and that it would be inappropriate to terminate parental rights.

The juvenile court found that while there was a bond between the parents and children, and they had a loving relationship, that was insufficient in and of itself. The juvenile court further found that the parents had a relatively insignificant relationship with the younger children in terms of playing a parental role, and, with respect to the older children, it could not say the parents met their burden of showing, by clear and convincing evidence, that adoption was not in the children's best interest. The juvenile

court found, by clear and convincing evidence, that the children were adoptable and, while not required, that at least some of the children were in adoptive placements. The juvenile court adopted the Agency's recommended findings and orders, terminated parental rights, and ordered adoption of the children.

## DISCUSSION

*Adoptability*

Father first challenges the juvenile court's finding that the three oldest boys, Isaiah, Elijah and Enrique, were adoptable. He argues that there was insufficient evidence these three were likely to be adopted within a reasonable amount of time because they are neither generally nor specifically adoptable. We disagree.

Both the evidentiary standard that applies to this issue in the juvenile court and our standard of review on appeal are well settled. At a section 366.26 hearing, the court must determine by clear and convincing evidence whether it is likely the minor will be adopted. (§ 366.26, subd. (c)(1).) If the court finds a likelihood of adoption, the court *must* terminate parental rights, unless one of the statutory exceptions to adoption exists. (*In re Celine R.* (2003) 31 Cal.4th 45, 53 [if evidence at section 366.26 hearing shows child is likely to be adopted, juvenile court "must order adoption and its necessary consequence, termination of parental rights, unless one of the [statutorily] specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child."]; *In re A.A.* (2008) 167 Cal.App.4th 1292, 1320 (*A.A.*).)

"Although a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold: The court must merely determine that it is 'likely' that the child will be adopted within a reasonable time. [Citations.] We review that finding only to determine whether there is evidence, contested or uncontested, from which a reasonable court could reach that conclusion. It is irrelevant that there may be evidence which would support a contrary conclusion." (*In re K.B.* (2009) 173

19.

Cal.App.4th 1275, 1292.) In other words, on appeal, "the clear and convincing test disappears and 'the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.'" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1526 (*I.W.*).) Moreover, we review the record in the light most favorable to the juvenile court's findings, and draw all inferences from the evidence that support the court's determination. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1177.)

"The adoptability issue at a section 366.26 hearing focuses on the dependent child, e.g., whether his or her age, physical condition, and emotional state make it difficult to find a person willing to adopt." (*A.A., supra,* 167 Cal.App.4th at p. 1311.) "It is not necessary that the child already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' [Citation.] [¶] Conversely, the existence of a prospective adoptive parent, who has expressed interest in adopting a dependent child, constitutes evidence that the child's age, physical condition, mental state, and other relevant factors are not likely to dissuade individuals from adopting the child. In other words, a prospective adoptive parent's willingness to adopt generally indicates the child is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family." (*A.A., supra,* 167 Cal.App.4th at pp. 1311–1312.)

Father's argument that the three boys are neither generally nor specifically adoptable obfuscates the adoptability issue before the juvenile court.**4** As this court explained in *In re G.M.* (2010) 181 Cal.App.4th 552, 562, not all dependency cases fall

---

**4** When assessing adoptability, courts have divided children into two categories: A child is "generally adoptable" if the child's traits, e.g., age, physical condition, mental state, and other relevant factors, do not make it difficult to find an adoptive parent; a child is "specifically adoptable" if the child is adoptable only because of a specific caregiver's willingness to adopt. (*In re R.C.* (2008) 169 Cal.App.4th 486, 492-494.)

neatly into one of two scenarios: one, where the availability of a prospective adoptive parent is *not a factor whatsoever* in a social worker's adoptability assessment, or two, where a child is likely to be adopted *based solely* on the existence of a prospective adoptive parent. As we explained: "These scenarios represent opposite ends on the continuum of when a child is likely to be adopted. However, many adoption assessments that recommend an adoptability finding fall somewhere in the middle. They consist of a combination of factors warranting an adoptability finding, including, as in this case, the availability of a prospective adoptive parent. This is the reality we confront, notwithstanding appellate arguments that assume a child is either generally adoptable without regard to a prospective adoptive parent or specifically adoptable based solely on the availability of a prospective adoptive parent." (*Ibid.*)

Here, the record discloses substantial evidence, as detailed above, of the adoptability of Isaiah, Elijah and Enrique, notwithstanding the "general" or "specific" labels father urges. These boys were fairly young; at the time of the hearing they were seven-, six- and five-years-old. They were physically healthy with no developmental delays; they did not receive services from Central Valley Regional Center. When first placed in foster care, Isaiah was described as lovable, Elijah was described as observant, quiet, and as curious, calm and good, and Enrique was described as a good, lovable, sweet boy, who liked to run and be silly. While being assessed for special education services, Enrique was described as friendly, cooperative and well-behaved, although he would sometimes get angry and scream at home or school. These boys were able to form positive attachments to their caregivers, as shown by their ability to develop a relationship with the foster mother who cared for them during the majority of the proceedings, who they called "grandmother."

While three boys had either speech, behavior or emotional problems that required intervention, those problems were all being addressed and, for the most part, improving. While Isaiah had been diagnosed with oppositional defiant disorder and had engaged in

21.

sexualized behavior, he was receiving therapy and his behavior was improving. By September 2013, Isaiah had become more loving and gentle. There had not been any sexualized behaviors since the initial report. By May 2014, his symptoms and behaviors had decreased notably, as his adaptive interactions with his siblings had increased, there was no aggression or profanity, and he had learned to ask adults for assistance when needed.

Although Elijah, who was diagnosed with disruptive behavior disorder, had been abusive to the foster mother, threatened to shoot her when he grew up, and had gone through a period when his symptoms had worsened, by May 2014, there was a notable decrease in the intensity and frequency of his impairing symptoms. Enrique was receiving speech services through his school to address his speech problem, which made it difficult to understand him. While he had not been receiving mental health services, he was going to be referred for a mental health evaluation, as there was concern about his behaviors, which included fighting, hitting, screaming and cussing.

There is nothing in the record to suggest that any of these boys' problems were so severe that it would make it difficult to find someone to adopt them. To the contrary, although the foster mother with whom they lived for most of the proceedings did not want to adopt them because of her age, she had grown attached to the boys, loved them and said it would be difficult to see them leave her home. Moreover, by the time Isaiah, Elijah and Enrique were having frequent visits and overnight visits with their respective identified adoptive parents, they were observed to respond to those parents' directives.

Finally, the identified adoptive parents were interested in adopting Isaiah, Elijah and Enrique. While at the time of the hearing these boys had just been placed in their prospective adoptive homes, their identified adoptive parents were aware of their needs through interacting with them during visits and the Agency providing them with information about the children's issues, yet remained interested in adopting them.

Although the relationships were still new, there were no reported problems with visits that had occurred.

Given the three boys' positive attributes, the progress they were making in overcoming their problems, as well as the interest shown by the prospective adoptive families, the juvenile court properly could find it was likely these three would be adopted. (§ 366.26, subd. (c)(1).)

Father contends that the evidence must show more than that the identified adoptive parents were interested in adopting the three boys; it must show they were committed to doing so. Relying on *In re Amelia S.* (1991) 229 Cal.App.3d 1060 (*Amelia S.*), he asserts that "[e]vidence that foster families are *considering* adoption of a child has been found insufficient to establish a likelihood of adoption." The present case, however, stands in stark contrast to *Amelia S.*, in which there were 10 dependent children, all with developmental, emotional and physical problems. (*Id.* at pp. 1062-1063, 1065.) The children were described as "'hard to place.'" (*Id.* at p. 1063.) None of the foster parents had agreed to adopt them, although the foster parents of five of the children were "*considering* adoption." (*Id.* at pp. 1062, 1065.) The remaining foster parents expressed no interest in adopting the remaining children. (*Id.* at pp. 1062-1063) The appellate court concluded that "[t]his is a far cry, however, from the clear and convincing evidence required to establish the *likelihood* of adoption," and that the juvenile court erred in finding that the children were adoptable and in terminating parental rights. (*Id.* at p. 1065.)

Here, there is no evidence that anyone has ever identified the three boys as hard to place children. To the contrary, the social worker opined that, based on the children's characteristics, there were foster-adopt families that may be willing to adopt them. Moreover, the identified adoptive parents were not just considering adoption; they demonstrated their commitment to adoption as shown by their efforts to develop

23.

relationships with these boys and by taking them into their homes.[5]  Their willingness to adopt distinguishes this case from *Amelia S.,* in which no such evidence existed.[6]

Similarly, father's citation to *In re Asia L.* (2003)107 Cal.App.4th 498 (*Asia L.*), is inapposite.[7]  There, the minors were observed to have extreme emotional and psychological problems requiring specialized placement.  (*Id.* at pp. 510-512.)  A report initially noted that one of the minors was considered "difficult to place" as there was no prospective adoptive parent identified for him.  (*Id.* at p. 511.)  A subsequent report observed that the foster parents were "'willing to explore adoption of the children, [but] it is too soon for [the foster parents] to make such a permanent and life changing decision.'"  (*Ibid.*)  Nevertheless, the social service agency opined that a prospective

_____

[5] Citing the CASA's June 3, 2014 report, which stated that Isaiah and Enrique's prospective adoptive parent expressed to the CASA some reservations about adoption due to Isaiah and Enrique's behavioral issues, father asserts the parent "made clear she was not necessarily going to adopt the boys."  As the Agency points out, that same CASA report indicated the social worker was scheduling a TDM to explore these concerns.  The identified adoptive parents participated in that meeting, which was held on June 6.  It was made clear that adoption was identified as the children's permanent plan, and the decision to place the children with their respective identified adoptive parents was made after a period of transition visits by Isaiah, Elijah and Enrique.  Ultimately, these three were placed with their identified adoptive families.  The juvenile court reasonably could conclude from this evidence that the identified adoptive families were committed to adopting these boys.

[6] We also noted that, after *In re Zeth S.* (2003) 31 Cal.4th 396, 405, the holding in *Amelia S.* is suspect, because the *Amelia S.* court reached its conclusion based, in part, on a report prepared after parental rights had been terminated, which for the first time described the dependent children as "'hard to place,'" having "'special needs,'" and "'suffer[ing] from social delays.'"  (*Amelia S.*, *supra*, 229 Cal.App.3d at p. 1063.)

[7] *Asia L.*, *supra*, 107 Cal.App.4th 498, was decided under a former version of section 366.26; the statute was amended in 2005, adding subdivision (i)(2), which provides that if, after three years following termination of parental rights, a child has not been adopted, the child could petition the juvenile court to reinstate parental rights.  (*In re I.I.* (2008) 168 Cal.App.4th 857, 871.)  That provision is now found in section 366.26, subdivision (i)(3).

adoptive family could be found for minors. (*Ibid.*) The appellate court concluded that "the foster parents' willingness to explore the option of adopting [minors] [was] too vague to be considered evidence that some family, if not this foster family, would be willing to adopt these children[,]" and "the social worker's conclusion alone is insufficient to support a finding of adoptability." (*Id.* at p. 512.)

In contrast here, although Isaiah, Elijah and Enrique had behavioral problems, which were improving or could be addressed by counseling, there was no evidence they required any specialized placement. Instead, their placement was stable and their behaviors were not the cause of any placement change. In addition, the identified adoptive families were not just willing to explore adoption; they had taken the boys into their homes and were willing to adopt them.

Father argues the juvenile court, instead of terminating parental rights, should have identified adoption as the permanent placement goal and ordered efforts be made to locate an adoptive family pursuant to section 366.26, subdivision (b)(4). This requires the juvenile court to find, under section 366.26, subdivision (c)(3), that the child is "difficult to place for adoption" and "there is no identified or available prospective adoptive parent." The juvenile court, however, did not make these findings. Moreover, the evidence established that the boys did have identified prospective adoptive parents; therefore, this option would not have applied.

We conclude substantial evidence supported the juvenile court's finding that Isaiah, Elijah and Enrique were adoptable.

*The Beneficial Parental Relationship Exception to Adoption*

Father contends if there is a likelihood of adoption, termination of his parental rights would be detrimental to all four boys, Isaiah, Elijah, Enrique and Nicholas, under the statutory exception to adoption under section 366.26, subdivision (c)(1)(B)(i), based on his regular visitation and contact with the boys, and their bond with him, which exception the juvenile court declined to apply.

25.

There is a split of authority concerning the standard of review in this context. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315 (*Bailey J.*) and *In re K.P.* (2012) 203 Cal.App.4th 614, 621–622 [hybrid combination of substantial evidence and abuse of discretion standards; applying substantial evidence test to determination of the existence of a beneficial parental or sibling relationship and the abuse of discretion test to issue of whether that relationship constitutes a compelling reason for determining that termination would be detrimental to the child]; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*) [substantial evidence test—"On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order"]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D.*) [abuse of discretion test].) Father asserts the substantial evidence standard of review applies to our review of the beneficial parental relationship exception, while the Agency asserts review is for abuse of discretion.

Our conclusion in this case would be the same under any of these standards because the practical differences between the standards are "not significant," as they all give deference to the juvenile court's judgment. (See *Jasmine D., supra,* 78 Cal.App.4th at p. 1351.) "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did.' . . ."'" (*Id.* at p. 1351.) Moreover, a substantial evidence challenge to the juvenile court's failure to find a beneficial parental or sibling relationship cannot succeed unless the undisputed facts establish the existence of those relationships, since such a challenge amounts to a contention that the "undisputed facts lead to only one conclusion." (*I.W., supra,* 180 Cal.App.4th at p. 1529; *Bailey J., supra,* 189 Cal.App.4th at p. 1314.)

Once the court determines a child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental under one of the statutory exceptions. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809.) To avoid termination of parental rights under the parent-child relationship exception, the juvenile court must find "a compelling reason for determining that termination would be detrimental to the child" due to the circumstance that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

The Court of Appeal in *Autumn H.* defined a beneficial parent/child relationship as one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) "[T]he court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

A parent must show more than frequent and loving contact or pleasant visits for the exception to apply. (*In re C.F.* (2011) 193 Cal.App.4th 549, 555 (*C.F.*); *In re C.B.* (2010) 190 Cal.App.4th 102, 126; *I.W., supra,* 180 Cal.App.4th at p. 1527.) "The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.] Further, to establish the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated." (*C.F., supra,* at p. 555.)

In this case, the juvenile court found that while father had a bond with the boys, as well as a loving relationship with them, he had not met his burden of proving that

adoption was not in the boys' best interest. Essentially, the juvenile court found his relationship with the boys did not promote their wellbeing to such a degree that it outweighed the wellbeing they would gain in a permanent home with new adoptive parents.

It is undisputed that father maintained regular visitation with the boys. We agree with the juvenile court, however, that he failed to meet his burden of proving the boys would benefit from continuing their relationship with them, or that the relationship promoted the boys' wellbeing to such a degree that it outweighed the well-being they would gain in a permanent adoptive home. Even if, as father testified, the boys expressed a desire to return home with him, the evidence showed that the actual quality of their visits was poor, their interaction with father was minimal, and when they did interact, father would engage in inappropriate conversations by telling them they would be coming to live with him and mother.

Contrary to father's suggestion, the factors set forth in *In re Angel B.* (2002) 97 Cal.App.4th 454, do not establish the existence of a substantial, positive attachment between him and the boys such that they would be greatly harmed by the severing of the parent/child relationship. In that case, the court held the factors to be considered when looking for whether a parent/child relationship is important and beneficial are: "(1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*Id.* at p. 467, fn. omitted; see also *Bailey J., supra,* 189 Cal.App.4th at p. 1315.)

When these proceedings started, the boys were five, four, three and two years old, and had spent the majority of their lives in father's custody. However, regarding the third factor, the interaction between father and the boys was not positive. On a few occasions, the boys refused to visit the parents until prompted to do so. The boys sought attention from the person supervising the visit, rather than the parents, and only sought their

28.

parents' attention when they wanted the parent to take a toy away from a sibling. Father would bring sugary snacks to visits even when asked to bring healthy snacks because the boys were hyperactive during visits. The boys usually played by themselves and ate during visits. Father was oblivious to the boys' needs and would ask supervising staff for guidance when they needed to use the restroom. Father's attempts to redirect and discipline the boys were unsuccessful; the boys did not listen to father's directives to stop hitting each other and did not look to him for comfort. At the end of visits, the boys ran out to their caregivers without saying goodbye to father. On the other hand, the boys responded to their identified adoptive parents and were receptive to their directives. As to the fourth factor, there was no evidence the boys had any needs that could be met only by father. (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81.)

On this record, the juvenile court could reasonably find the boys' need for permanence outweighed the benefits they would derive from a continued relationship with father. It also could find that severing the boys' relationship with father would not deprive them of a substantial, positive emotional attachment that would greatly harm them. Accordingly, the juvenile court did not err by declining to apply the beneficial relationship exception to the termination of father's parental rights.

## DISPOSITION

The order terminating parental rights is affirmed.

_____

Gomes, J.

WE CONCUR:

_____

Hill, P.J.

_____

Cornell, J.